# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | No. 3:16-cr-26 (JAM) |
| ANDREW ORECKINTO,<br>*Defendant*. | |

## ORDER DENYING MOTION FOR JUDGMENT OF ACQUITTAL

A federal trial jury found defendant Andrew Oreckinto guilty of theft of goods from an interstate shipment, in violation of 18 U.S.C. § 659. Defendant has now moved for judgment of acquittal pursuant to Fed. R. Crim. P. 29(c), asserting that the evidence presented by the Government was insufficient to prove that all or some of the goods stolen were part of an interstate shipment at the time of the theft. For the reasons set forth below, I will deny the motion.

### BACKGROUND

The relevant undisputed facts are as follows: defendant was charged with theft of more than 8,000 cartons of cigarettes from the New Britain Candy Company (NBCC) warehouse in Wethersfield, Connecticut. As the evidence showed at trial, NBCC was at the time of the theft a business that ordered, warehoused, and then shipped goods, particularly cigarettes, to various Food Bag convenience stores throughout Connecticut and in Massachusetts, New York, and New Jersey. NBCC ordered cigarettes from out-of-state cigarette manufacturers that it used to fulfill future orders to Food Bag convenience stores; it projected how many cigarettes to order and stock ahead of time based on historical fulfillment figures from each Food Bag store.

When the cigarettes arrived in cases at the NBCC warehouse, they were paid for, became the property of NBCC, and were posted to inventory. NBCC would then cut the cases of

1

cigarettes in half, and store the half-cases in a shelving area by cigarette brand. The cigarettes stayed in that shelving area until a specific order came in from a Food Bag store, after which an NBCC "picker" would select the requested cigarettes from the various shelves to begin fulfillment of the order.

Before cigarettes could be sold, each pack was legally required to receive a tax stamp from the state in which the cigarettes would be sold. Those tax stamps were purchased ahead of time by NBCC based on historical fulfillment figures from Food Bag stores in each state, and the stamps were stored in a safe in the warehouse. After NBCC received an order from a Food Bag store and the picker selected the requested cigarettes, the appropriate tax stamps would be applied to the cigarettes based on the store to which the cigarettes were destined. After the stamp was applied, the cigarettes were sent down a conveyer belt to a loading dock, where they were placed on an NBCC truck for shipment.

The vast majority of cigarettes supplied by NBCC were sent to Food Bag stores within Connecticut, representing approximately 88% of all NBCC cigarette sales. And because sales to Connecticut represented such a high percentage of overall sales, NBCC ran trucks to Connecticut Food Bag stores every day of the week. The remaining 12% of cigarette sales were made to out-of-state Food Bag stores by the following truck schedule: to Massachusetts on Mondays and Wednesdays (approximately 4% of sales), and to New York on Thursdays and Fridays (approximately 6% of sales), with New Jersey (approximately 1% of sales) at the tail end of one of the New York runs. At trial, the Government presented evidence from Ted Hasty, the head of loss prevention for the parent company of both NBCC and Food Bag, who testified that NBCC's entire cigarette inventory turned over approximately every week and a half, or at least that was NBCC's goal for an inventory turnaround rate. *See* Doc. #86 at 7.

The theft of NBCC occurred during the weekend of March 18, 2011, after the business had closed and would not reopen until Monday. By that Friday evening, the trucks for Monday's delivery—to Connecticut and Massachusetts Food Bag stores—had been packed with stamped cigarettes, and they were parked in the loading dock area ready to leave on Monday morning. None of the loaded trucks were stolen or disturbed during the theft; instead, the thief took approximately 8,012 cartons of shelved, unstamped cigarettes. This theft constituted approximately 72% of NBCC's cigarette inventory at the time and was valued at approximately $329,000.

The Government introduced a chart produced by Hasty that showed a breakdown of cigarette sales by state for the 23 weeks leading up to the theft. *See* Govt. Exh. 500K. Hasty calculated that, of the $329,000 worth of cigarettes stolen, approximately $40,000 worth of stolen cigarettes would have been sent to out-of-state Food Bag stores in that coming week. *See id.* at 7–8. The Government also introduced invoices for cigarettes shipped to out-of-state Food Bag stores in the week following the theft, which far exceeded $1,000 in sales. *See* Govt. Exhs. 500M (Massachusetts); 500N (New Jersey); 500O (New York). Hasty testified that the amount of product that shipped out of state in the week following the theft was numerically close to his percentage calculations based on prior sales. *See* Doc. #86 at 78.

The jury was instructed that it could not find defendant "Guilty" unless the Government had proved, beyond a reasonable doubt, all the elements of 18 U.S.C. § 659, including that:

> at the time of the theft, all or some of the cartons of cigarettes that were stolen were part of an interstate shipment—that is, that they were then moving as, were a part of, or constituted an interstate shipment. Goods are part of an interstate shipment if they have been prepared or set aside for transportation from one state to another state even though the goods have not yet been moved across state boundaries. Similarly, goods are part of an interstate shipment if they have already been moved from one state to another, until they arrive at their final destination or are delivered. Thus, even if goods are at a

temporary stop while awaiting transshipment, if the goods are not at their final
destination in a different state, then the goods are part of an interstate shipment.

Doc. #78 at 9. The jury deliberated for about one day before rendering a verdict of "Guilty."

## DISCUSSION

The standard governing the Court's review of defendant's motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29 is well established. The Court must review the evidence in the light most favorable to the prosecution and sustain the jury's verdict if any rational trier of fact could have found the evidence sufficient to establish the elements of each crime beyond a reasonable doubt. *See United States v. Brock*, 789 F.3d 60, 63 (2d Cir. 2015) (*citing Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "The established safeguards of the Anglo-American legal system leave the veracity of a witness to be tested by cross-examination, and the credibility of his testimony to be determined by a properly instructed jury." *Hoffa v. United States*, 385 U.S. 293, 311 (1966).

The charge under 18 U.S.C. § 659 in this case required the Government to prove the following elements:

(1) that defendant knowingly and intentionally stole or unlawfully took cartons of cigarettes that were stored at the New Britain Candy Company warehouse;

(2) that defendant stole or unlawfully took the cartons of cigarettes with the intent to convert them to his own use;

(3) that, at the time of the theft, all or some of the cartons of cigarettes that were stolen were part of an interstate shipment—that is, that they were then moving as, were a part of, or constituted an interstate shipment; and

(4) that the cartons of cigarettes that were stolen and that were part of an interstate shipment had a value in excess of $1,000.

As to the interstate element, had defendant stolen the trucks sitting at the loading dock of the NBCC warehouse and filled with stamped cigarettes ready for delivery on Monday morning

to locations in Massachusetts, the interstate element would undeniably have been met. *See United States v. Astolas*, 487 F.2d 275, 281 (2d Cir. 1973). Instead, however, defendant stole cigarettes that had not yet been specifically selected and designated for particular interstate orders. According to defendant, this undesignated status of the stolen cigarettes means that the evidence was not legally sufficient to show that, at the time of the theft, all or some of the cartons of cigarettes that were stolen were part of an interstate shipment.

Defendant first argues that the evidence was insufficient because the Government did not introduce a waybill or shipping document showing that the stolen cigarettes had already been committed to out-of-state orders. The introduction of waybill evidence is a statutorily-authorized method of proving the interstate shipment element. *See* 18 U.S.C. § 659 ("To establish the interstate or foreign commerce character of any shipment in any prosecution under this section the waybill or other shipping document of such shipment shall be prima facie evidence of the place from which and to which such shipment was made."). Because the Government introduced only the waybills indicating shipment from cigarette manufacturers to the NBCC in Connecticut, defendant asserts that a presumption arose that the stolen cigarettes had reached their final destination in Connecticut. *See* Doc. #88 at 6–7. I do not agree. The law makes waybills and shipping documents *prima facie* evidence of the interstate nature of a shipment, but it does not prohibit establishing that element by other evidentiary means. *See United States v. Baird*, 403 F. App'x. 57, 63 (6th Cir. 2010).

The law requires a common-sense approach to interpretation of the interstate shipment element, because—as the Second Circuit has explained—§ 659 was "designed by the Congress to promote the flow of goods in interstate commerce, and . . . the carrying out of this purpose is not to be hampered by technical legal conceptions." *Astolas*, 487 F.2d at 279. Accordingly, "the

5

determination that a shipment is interstate is essentially a practical one based on common sense and administered on an ad hoc basis. It depends on such indicia of interstate commerce as . . . the physical location of the shipment when stolen, whether the goods have been delivered to a carrier at the time of theft, . . . where there is no carrier, what steps the owner has taken to carry out an interstate shipment, and the certainty with which interstate shipment is contemplated, as evidenced by shipping documents." *Id.* at 279–80 (citations omitted).

Thus, despite the term "shipment" in the statute, the goods in question need not be in actual motion between states, or already placed in a truck all ready for out-of-state delivery in order to satisfy the interstate shipment element of § 659. *See id.* at 279; *see also United States v. Berger*, 338 F.2d 485, 488 (2d Cir. 1964) ("[T]he intent prescribed by this rule need only be an intent that the goods travel to their ultimate destination. There need not be an intent from the outset that the goods travel by an interstate route."). After all, § 659 specifically contemplates that goods stolen from a "warehouse" may nevertheless qualify as "moving as or which are a part of or which constitute an interstate or foreign shipment." 18 U.S.C. § 659.

On the basis of the statute's evident purpose and economic realities of interstate commerce, I conclude that the interstate shipment requirement may be satisfied by evidence of a business's general practices to ship a certain portion of its goods to out-of-state locations. Even in the absence of interstate waybills and in the absence of evidence that the stolen goods had already been physically set aside or otherwise specifically designated for interstate shipment, the interstate shipment requirement of § 659 may be satisfied on the basis of evidence concerning the routine and normal practices of a business to ship all or a significant portion of its inventory to out-of-state locations. *See United States v. Bizanowicz*, 745 F.2d 120, 122 (1st Cir. 1984) (evidence sufficient to establish interstate element based on high percentage of out-of-state

shipments "in accordance with normal practices"); *United States v. Maddox*, 394 F.2d 297, 299 (4th Cir. 1968) (evidence sufficient to establish interstate commerce element based on theft from sugar broker's warehouse and regular practice of warehouse to ship sugar to pre-determined, out-of-state buyers and despite "the fact that the individual bags were not held for specific customers").[1]

Based on the NBCC warehouse's shipping practices, a reasonable jury could have concluded that the interstate shipment element was proven beyond a reasonable doubt in this case. The evidence showed that the slightly more than 8,000 cartons of stolen cigarettes had an aggregate value of $329,000. Accordingly, each stolen carton of cigarettes was worth on average about $40. The statute requires that the theft have involved at least $1,000—this would be the value of only about 25 cartons of the more than 8,000 that defendant stole. Based on the fact that the warehouse routinely shipped 12% of its inventory out of state, the jury could easily have concluded that at least 25 cartons of the 8,000 stolen cartons (0.3%) were indeed destined for out-of-state shipment.[2]

The historical sales figures for the 23 weeks before the theft revealed that interstate shipments had been made every single week during each of 23 weeks, and that each week produced over $1,000 worth of interstate sales. That fact, coupled with the interstate sales made immediately following the theft and Hasty's testimony about inventory turnover rates, could have led the jury to reasonably infer that interstate shipments would soon have been made from a

---

[1] As defendant correctly notes, the facts in *Bizanowicz* involved evidence that the company shipped more than 90% of its inventory out of state—a far higher percentage than the out-of-state shipment data in this case. But that factual distinction does not detract from the recognition in *Bizanowicz* that the interstate shipment element may be predicated on evidence of a business's practices to ship a proportion of its inventory to out-of-state locations.

[2] Defendant insists that "there was a possibility—a mere 12% chance—that at some point in the future the cigarettes were going to be shipped out of state." Doc. #88 at 10–11. But this argument is statistically misleading, because the 12% figure describes no more than the probability that any particular one carton was destined for interstate shipment, not the probability that of the more than 8,000 cartons that were actually stolen at least 25 of these cartons were destined for interstate shipment.

portion of the large quantity of cigarettes stolen by defendant. Indeed, the next interstate shipment made from a portion of the stolen cigarettes was likely to be the Wednesday after the theft—a shipment out to Massachusetts.

To be sure, other cigarettes housed in the NBCC warehouse were further along in the interstate shipment process, such as the untouched cigarettes sitting in the truck bays that had been stamped and picked out for specific out-of-state orders. But a reasonable jury could have inferred based on its common sense that a sufficient portion of the cigarettes stolen from NBCC's general inventory had not reached their final destination, a destination outside of the state of Connecticut. *See United States v. Bloome*, 784 F. Supp. 23, 29 (E.D.N.Y. 1992) (noting that "the high percentage of out-of-state business conducted by the commercial establishments from which the goods were stolen virtually compels the conclusion that a theft of finished goods from those businesses is a theft of goods that are 'destined for out of state delivery'").

I have considered all of defendant's additional arguments as set forth in his papers and by oral motions for judgment of acquittal during trial (Docs. #69, #73), and I conclude that they are without merit for substantially the reasons stated by the Government. The evidence presented by the Government was easily sufficient to allow a jury to conclude that defendant was the perpetrator of the theft of the warehouse, and the evidence was otherwise legally sufficient to support defendant's conviction.

## CONCLUSION

For the foregoing reasons, defendant's motion for judgment of acquittal pursuant to Fed. R. Crim. P. 29 (Doc. #88) is DENIED.

It is so ordered.

Dated at New Haven, Connecticut this 14th day of April, 2017.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge